THE UNTIED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| VICTORIA INENDINO, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 06 C 5951 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Arlander Keys |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of the Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Victoria Inendino, moves this Court for summary judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, to reverse or remand the final decision of the Commissioner of Social Security ("The Commissioner"), denying her claim for a period of disability and disability insurance benefits ("DIB") 42 U.S.C. § 405(g)(2003). Defendant has filed a cross-motion for summary judgment, asking this Court to affirm the Commissioner's final decision. For the reasons set forth below, the Court grants the defendant's cross-motion for summary judgment, and affirms the Commissioner's decision.

## Procedural History

Victoria Inendino filed an application for a period of disability and disability insurance benefits on October 15, 2003, alleging that she became disabled on June 30, 1997. R. at 172. She was insured on that date and continued to be insured through December 31, 2002. The Social Security Administration ("SSA") initially denied Ms. Inendino's application on December 22, 2003, and again after reconsideration on February 10, 2004.

Ms. Inendino timely filed a request for a hearing before an Administrative Law Judge ("ALJ"). Following Ms. Inendino's request for a hearing, ALJ James A. Horn granted the plaintiff a hearing, which was held on January 6, 2006. At the hearing, Ms. Inendino amended her date of disability onset to December 31, 2002 to coincide with her date last insured. (R. at 175). In addition, at the hearing, she was the only witness called to testify, and in a decision dated May 19, 2006, the ALJ found Ms. Inendino "not disabled," and therefore, ineligible for DIB. R. at 13.

On September 1, 2006, the Appeals Council denied the plaintiff's request for review of her claim, making the ALJ's determination the final agency decision. R. at 3. Ms. Inendino filed the present action on March 2, 2008, seeking reversal of the Commissioner's final decision, or in the alternative, remand

2

for further proceedings. For the reasons set forth below, this Court affirms the denial of benefits in this case, and denies plaintiff's motion for summary judgment.

## Factual Background

### 1. The Plaintiff's Background and Testimony

Ms. Inendino was born                          On the date of the hearing, Ms. Inendino was 43 years old, was not married, and had no children. Ms. Inendino had resided in a house for five years with her boyfriend, who worked at Jewel-Osco. At the hearing, Ms. Inendino testified that she could read and write in the English language, but dropped out of high school during her junior year because she "just wanted to work." R. at 177. She also currently holds a driver's license and is able to complete household chores, such as cooking and cleaning. R. at 178, 185. During the day, she stays at home doing chores around the house, watches television, or goes to the grocery store. R. at 188.

Ms. Inendino also testified that she worked for K-Mart, Senior Flexonics, and McMaster Car Supply Company prior to the hearing, and held various positions including, performing word processing, blueprinting and receptionist duties. R. at 177-181. According to the plaintiff, her last employer at the time of the hearing was Senior Flexonic ("Flexonic"), where she worked for about four years until June 30, 1997. R. at 51, 178. Ms.

3

Inendino testified that she sat during the majority of work hours while carrying out her job duties at Senior Flexonic. She characterized her job duties as receptionist work and blueprinting, which involved making photocopies of blueprints, greeting in person customers, and answering the telephone. R. at 178. The plaintiff also testified that she occasionally lifted boxes of paper and labels weighing about ten or fifteen pounds while employed at Flexonics. R. at 180. According to the plaintiff, she left Flexonics in 1997 because she was "unhappy with [her] employer" and tried to "find a better job, [but] was unable to find [one]." R. at 51.

She further testified that, prior to her employment with Flexonic she worked for McMaster Car Supply from some time in the 1980s until 1992. R. at 180. There her responsibilities consisted mainly of office work, specifically, typing and working on the word process machine. The plaintiff testified that she was seated at least six hours during an eight hour work day. R. at 180.

In approximately 1995, while she was still employed at Flexonic, Ms. Inendino was diagnosed with diabetes. R. at 181. She was prescribed an oral agent to treat her diabetes, but thereafter discontinued her prescription within the same year. R. at 182. According to Ms. Inendino, she had not been

4

hospitalized or under the care of any doctor between her diagnosis in 1995 and January 2003. R. at 182. Ms. Inendino testified that, during this period, she suffered from symptoms of diabetes, such as, dehydration, fatigue, blurred vision, and swelling of her hands and feet. R. at 187, 188. She claimed, however, that she had not experienced blurry vision since 2002. Id. However, her complications with diabetes did not end there.

In January of 2003, Ms. Inendino was hospitalized for diabetic ketoacidosis. R. at 101. According to Ms. Inendino, after her hospitalization, she began to see Dr. William Mollohan, who examined her during seven visits, from April 29, 2003 until March 29, 2004.[1] In response to her hospitalization for diabetic ketoacidosis, Dr. Mollohan prescribed insulin for her low blood sugar, but as her condition improved, Dr. Mollohan changed her prescription to oral medication. R. at 102, 187. However, according to the plaintiff, on approximately March 29, 2004, Dr. Mollohan discontinued her treatment for nonpayment of funds. R. at 185. Subsequently, Ms. Inendino sought treatment from Dr. Delgadillo, who continued to prescribe oral medication to treat her diabetic condition, twice in February of 2005 and once in July of 2005.

[1] Although the plaintiff claims that she visited Dr. Mollohan seven times, she did not provide records for any of those visits. R. at 174.

5

According to Ms. Inendino, while under the care of Dr. Delgadillo, her medical condition showed continuous improvement and did not result in subsequent visits to the emergency room. Dr. Delgadillo, according to the plaintiff, prescribed Glipizide and Actose for her diabetes, and Losinopril for circulation in her kidneys. R. at 183. The plaintiff also testified that she suffers daily from tiredness and confusion due to her diabetic condition; however, she is able to rectify the on-set of her confusion by eating candy and sitting until the symptoms subside. R. at 185-187. The plaintiff also testified that she is able to do basic activities, such as cooking and cleaning, but at a slower pace. R. at 185. At the end of her testimony, the plaintiff stated that she "could probably do the work," at her previous employment, Senior Flexonic; however, she was concerned that she may not be able to access food or rest if needed while working. R. at 188.

## Medical History

In addition to the live testimony of Ms. Inendino, the ALJ also considered the medical records on file. During the years following her diagnosis of diabetes, it appears that the plaintiff at some to was seen by a Dr. Bell from Dreyer Medical Clinic and was supposed to be taking Glucophage to help control her diabetes, however, for some reason, which is not clear in the

6

record, she discontinued taking the medication. R. at 108. It appears that, after Dr. Bell stopped treating the plaintiff, she was not treated by another physician until her hospitalization in 2003.

Ms. Inendino was admitted to Provena Mercy Center on January 23, 2003 for complaints of mental status changes, diffuse generalized weakness, and abdominal pain. R. at 102-36. While in the hospital, Ms. Inendino was treated by Dr. William Mollohan who, after the plaintiff's discharge on January 29, 2003, continued to treat her. Upon her discharge, Dr. Mollohan diagnosed her with diabetic ketoacidosis; new onset diabetes mellitus; electrolyte imbalance; status post cholecystectomy; bronchopneumonitis; gastritis; gastroparesis; confusion; severe dehydration; and flat affect, with a consideration of mild mental retardation versus chronic depression. R. at 103. Dr. Mollohan instructed plaintiff to check her blood sugar three to four times daily and scheduled Ms. Inendino to return in 48 hours. R. at 103.

Dr. Mollohan completed a diabetic report from the Bureau of Disability Determination Services on November 11, 2003. R. at 137. On the questionnaire, Dr. Mollohan noted that his most recent examination of Ms. Inendino was in September 2003. *Id.* Dr. Mollohan reported that the plaintiff's onset of diabetes

7

mellitus commenced January 23, 2003, and that he discontinued Ms. Inendino's insulin prescription in August 2003. *Id.* Dr. Mollohan further noted that Ms. Inendino's therapy included a diabetic diet, along with other medications. Dr. Mollohan described Ms. Inendino's compliance as "good," and no further complications resulted. When asked to describe any other impairments or conditions not covered by the Diabetic Report, Dr. Mollohan wrote "[b]orderline personality mental retardation." R. at 138. He, also, described Ms. Inendino's ability to do work-related activities such as sitting, standing, moving about, lifting, carrying, handling objects, hearing, speaking, as problematic. Dr. Mollohan stated that Ms. Inendino could not multi-task or follow through on simple instructions, and stated that "even menial jobs" were a problem for her. *Id.* Dr. Mollohan further stated that Ms. Inendino would require close observation with frequent corrections, even on a good day. *Id.* The record does not contain any other reports or treatment records from Dr. Mollohan.[2]

In addition to the plaintiff's treating physician, Dr. John L. Peggau, Psy.D., evaluated Ms. Inendino at the request of the state agency on December 3, 2003. R. at 141-45. Dr. Peggau

---

[2]The ALJ left the record open for 30 days in order to give plaintiff an opportunity to obtain an explanation for the missing records or the treatment notes of Dr. Mollohan. R. at 189. The plaintiff failed to produce either item.

8

noted that Ms. Inendino drove alone to the evaluation and stated that she was applying for disability because of confusion and difficulty concentrating. R. at 142. Dr. Peggau observed that plaintiff had articulate speech and no difficulty with directions or following through on instructions or remembering tasks at hand. *Id.* Dr. Peggau also noted that the plaintiff had a Wechsler Adult Intelligence Scale-III full scale intelligence quotient ("I.Q.") score of 79, verbal I.Q. score of 81, performance I.Q. score of 80, demonstrated low average intellectual functioning, but found it clear that the plaintiff was not mentally retarded. R. at 143, 145. Dr. Peggau deferred a diagnosis, but rated the plaintiff's Global Assessment of Functioning at 85. *Id.*[3]

Two state agency psychologists reviewed the evidence in the record (once in December of 2003 and then again in February of 2004) and opined that plaintiff did not have a severe mental impairment. R. at 146-59. In addition, during the same time period, two state agency physicians, Drs. Reynaldo Gotanco and Paul E. Smalley, reviewed the record evidence and completed a Physical Residual Functional Capacity Assessment in reference to the plaintiff. R. at 160-67. Both doctors opined that the

[3]The GAF rating assesses an individual's overall level of psychological, social, and occupational functioning. American Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* (DSM-IV-TR) 32-34 (4th ed. Text Revision 2000). A GAF rating of 81-90 indicates an individual with absent or minimal symptoms and good functioning in all areas. *Id.* at 34.

9

plaintiff could perform a range of medium work, with some
postural limitations.  *Id.*

## The ALJ's Decision

In an opinion dated May 19, 2006, the ALJ found that Ms.
Inendino was not under a "disability" as defined in the Social
Security Act, at anytime through the date of the ALJ's decision.
20 C.F.R. 404.1520(c) (2002).  Specifically, the ALJ found that
the plaintiff suffered from diabetes mellitus and low average
intellectual functioning, but that these impairments did not
significantly limit the plaintiff's ability to perform work-
related activities.  In formulating his opinion, the ALJ relied
on the evidence in the record, which included the following: the
plaintiff's testimony, the treating physician's opinion, and the
consultative psychological evaluations.  Collectively, the
evidence convinced the ALJ that the plaintiff did not have a
severe impairment.

In assessing the plaintiff's testimony, the ALJ found her
testimony and subjective complaints insufficient to establish a
severe impairment.  First, the ALJ considered the fact that the
plaintiff had an eleventh grade education, was literate, had a
driver's license, and operated a motor vehicle, along with her
daily activities, which included watching television and
shopping.  This led the ALJ to conclude that the underlying

10

mental impairment caused no restrictions in her daily activities. Next, the ALJ noted the plaintiff's complaints of confusion and tiredness, but explained that she is able to remedy these symptoms by eating candy when this occurs. The ALJ also noted that the plaintiff had never experienced any numbness or tingling in her extremities. Moreover, the ALJ emphasized that the plaintiff testified that she could still do the office receptionist work, provided that candy is available.

In addition to the plaintiff's testimony, the ALJ compared the treating physician's opinion and the consultative psychological evaluation. The ALJ ultimately rejected Dr. Mollohan's opinion because he lacked documentation to support his conclusion. The ALJ further reasoned that the plaintiff's subjective complaints were not credible because they were not supported by documentary evidence in the record, and while her treating physician's opinion appeared to support her claims, his opinion too lacked documentary evidence in the record. The ALJ also gave less weight to competing expert medical opinions. but found that Dr. Peggau's evaluation coincided with the whole record, and concluded that the plaintiff's impairments did not limit her physical or mental ability to perform basic work related activities.

## STANDARD OF REVIEW

A district court reviewing an ALJ's decision must affirm if the decision is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion " *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In reviewing an ALJ's decision for substantial evidence, the Court may not "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (*citing Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). While an ALJ need not address every piece of evidence in the record, he must articulate his analysis by building an accurate and logical bridge from the evidence to his conclusions, so that the Court may afford the claimant meaningful review of the SSA's ultimate findings. *Sims v. Barnhart*, 309 F.3d 424, 429 (7th Cir. 2002). It is not enough that the record contains evidence to support the ALJ's decision; if the ALJ does not rationally articulate the grounds for that decision, or if the decision is

not sufficiently articulated. so as to prevent meaningful review, the Court must remand. *Id.*

## SOCIAL SECURITY REGULATIONS

An individual claiming a need for DBI or SSI must prove that he or she has a disability under the terms of the SSA. In determining whether an individual is eligible for benefits, the social security regulations require a sequential five step analysis. First, the ALJ must determine if the claimant is currently employed; second, a determination must be made as to whether the claimant has a severe impairment; third, the ALJ must determine if the impairment meets or equals one of the impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1; fourth, the ALJ must determine the claimant's RFC, and must evaluate whether the claimant can perform his or her past relevant work; and fifth, the ALJ must decide whether the claimant is capable of performing work in the national economy.

## DISCUSSION

The Plaintiff contends that the ALJ erred in finding that she is not disabled. Specifically she argues that the ALJ's decision must be reversed or remanded, because: (1) the ALJ failed to give controlling weight to the opinion of her treating physician; (2) the ALJ should have found that the plaintiff suffered from a severe impairment at Step 2 during the RFC evaluation; and (3) the

13

ALJ ignored the plaintiff's testimony as to pain and other symptoms. The Court will examine these arguments in turn.

## A. The ALJ's consideration of the Treating Physician's Opinion

The plaintiff argues that the ALJ should accord controlling weight to Dr. Mollohan's opinion, the plaintiff's treating physician. Under 20 C.F.R. § 404.1527(e)(1) (2008) the responsibility for weighing the record evidence, including physicians opinions, and resolving conflicts therein rests with the ALJ. In cases involving conflicting medical evidence the ALJ has the duty to resolve that conflict. *Richardson v. Perales*, 402 U.S. 389, 399 (1971). Moreover, the ALJ is under no obligation to give any particular weight to a physician's opinion, unless the opinion falls under the treating physician rule. *See Whitney v. Schwiher*, 695 F.2d 784, 788 (7th Cir. 1982); *see also Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006).

The "treating physician" rule, 20 C.F.R. § 404.1527(d)(2) (2008), which as the 7th Circuit has explained, "'directs the administrative law judge to give controlling weight to the medical opinion of a treating physician if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence.'" *Bauer v. Astrue*, No. 07-3325, 2008 WL 2652887, at *1 (7th Cir. July 8, 2008) (*quoting Hofslien v. Barnhart*, 439 F.3d

14

375, 376 (7th Cir. 2006)). However, a treating physician's opinion may be rejected if it is brief, conclusory, and unsupported by medical evidence. *See Allision v. Heckler*, 711 F.2d 145, 185 (10th Cir. 1983); *see also Browning v. Sullivan*, 958 F.2d 817, 823 (8th Cir. 1992). Here, under the "treating physician rule," Dr. Mollohan's opinion lacked supporting medical evidence and substantially conflicted with Drs. Peggau and Gotanco's opinion, as well as, the plaintiff testimony; and therefore, the ALJ did not have to give his opinion controlling weight. 20 C.F.R. § 404.1527(e) (2008). *See Elder v. Astrue*, No. 07-2185, 2008 WL 2406256, at *8 (7th Cir. June 16, 2008). Although the ALJ did indeed consider Dr. Mollohan's medical opinions in formulating his decision, the ALJ was under no obligation to give Dr. Mollohan's conclusion controlling weight.

Under the treating physician rule, courts have held that a physician's opinion without supporting evidence is not binding on the fact finder. For example, in *Browning v. Sullivan*, the 8th Circuit found a conclusory letter[5], with no supporting medical evidence, written by a treating physician diagnosing a social security disability claimant as disabled, did not overcome the substantial medical evidence supporting findings that the

[5]The letter stated in its entirety: "To Whom It May Concern: RE: Viola Browning. Mrs. Browning is disabled. She is unable to work. She is in need of further medical evaluation and diagnostic study." *Browning v. Sullivan*, 958 F.2d 817, 823 (8th Cir. 1992).

15

plaintiff's condition did not prevent her from performing previous work. *See. Browning v. Sullivan*, 958 F.2d 817, 823 (8th Cir. 1992). Similarly, in the present case, the only evidence presented by the plaintiff supporting Dr. Mollohan's conclusions is just that; a report containing conclusory statements regarding her condition. For example, Dr. Mollohan writes that the plaintiff has "borderline personality mental retardation," without any guidance as to how he came to his conclusion. R. at 138. He also writes that the plaintiff "cannot multi-task" and "even menial jobs are a problem for her since she cannot follow through on simple instructions." *Id*. However, there are no treatment notes, or anything else for that matter, that may shed light on how it is that Dr. Mollohan came to his conclusions.

Although the plaintiff informed the ALJ that she was having difficulty locating Dr. Mollohan's treatment notes, he ALJ was under no obligation to try to find support for Dr. Mollohan's opinion, and she still bares the burden for finding adequate support for her disability claim. The Seventh Circuit has held that, "[i]t is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability." *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004). In *Scheck*, the ALJ kept the record open for thirty days after the hearing for the plaintiff to obtain documentary medical evidence to support her claim. The ALJ considered there to be "a

dearth of documentary medical evidence," and the Seventh Circuit noted that the plaintiff cannot fault the ALJ for his own failure to support his claim of disability.

The same can be said for the present case. The ALJ left the record open for 30 days, and addition, told Ms. Inendino's attorney that, if he needed more time to locate Dr. Mollohan's treatment notes, he should contact his clerk. R. at 189. Furthermore, the ALJ also informed Ms. Inendino's attorney that, if he could not locate the treatment notes, he was to provide an explanation as to why. Therefore, similar to *Scheck*, the ALJ gave the plaintiff a full opportunity to complete the record; and as a result of not receiving a reciprocal effort from the plaintiff, the ALJ properly gave Dr. Mollohan's analysis "little weight."

Though the ALJ had little information from Dr. Mollohan to articulate his findings; notwithstanding, he used Dr. Mollohan's conclusory statements, looked to the record, the opinions of other psychologists who had evaluated plaintiff, and also considered plaintiff's testimony given at the hearing. The ALJ evaluated Dr. Mollohan's opinion, but reasonably gave less weight to his findings. First, Dr. Mollohan lacked treatment records to support his findings. Furthermore, according to the plaintiff, over the seven visits to see Dr. Mollohan within one year, she showed improvements. In particular, the plaintiff's prescription changed from insulin to oral medication. Furthermore, the plaintiff

previously worked with diabetes similar to many people with her condition. Although Dr. Mollohan noted further diagnosis of borderline personality mental retardation. he did not go so far as to conclude total mental retardation; hence, his conclusion does not conflict with the assessment of Dr. Peggau that the plaintiff did not suffer from mental retardation.

Dr. Peggau, the consultative psychologist, observed basic work characteristics during his psychological evaluation of the plaintiff, that support a finding that the plaintiff impairments are not severe. For example, the plaintiff possessed a driver's license and frequently drove. Because driving requires one to adhere to traffic laws and balance distractions, while observing one's surroundings, the fact the plaintiff was able to drive conflicts with Dr. Mollohan's opinion that plaintiff could not multi-task and that even a menial job would be problematic. In addition, Dr. Peggau wrote that the plaintiff showed no difficulty with directions, remembered and followed instructions, communicated articulately, with 100% audible and understandable speech, understood conversational voice, and displayed normal motor activity. R. at 142.

The plaintiff, moreover, testified that she routinely does "average things," such as chores, cooking, grocery shopping, and "could probably do the [office] work" similar to her previous employment. R. at 185, 188. Only her treating physician, Dr.

Mollohan, concluded, without documentation, that the plaintiff will need assistance with basic tasks.

What the plaintiff must keep in mind is that, if the ALJ discounts the physician's opinion after considering all the evidence, the court must allow that decision to stand so long as the ALJ "minimally articulate[d]" his reasons, a very deferential standard that the Seventh Circuit has, in fact, deemed "lax." *Elder v. Astrue*, No. 07-2185, 2008 WL 2406256, at *9 (7th Cir. June 16, 2008)(*quoting Berger v. Astrue, 516 F.3d 539, 545* (7th Cir. 2008)). The ALJ articulated the reasons why he gave "little weight" to Dr. Mollohan's opinion; mainly that it was unsupported by treatment notes and the rest of the record, including the plaintiff's own testimony. Because the ALJ fulfilled his obligations, this Court finds that the ALJ's treatment of the plaintiff's treating physician's opinions were proper.

## B.    The ALJ's Step Two Determination.

The plaintiff asserts that the ALJ erred by finding that her exertional and non-exertional mental impairments are not "severe." The Commissioner, on the other hand, counters that, the plaintiff's impairments are not "severe," because collectively the evidence supports a finding that the plaintiff's impairments did not significantly limit her ability to perform work related activities. The Court finds that the medical evidence and the plaintiff's testimony both support the ALJ's

finding that the plaintiff does not have a severe impairment or combination of impairments that limit her physical or mental ability to do basic work activities.

The plaintiff has the burden of establishing a "severe" impairment at step two of the five-step sequential evaluation. *See Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). If the plaintiff does not have a severe medically determinable physical or mental impairment or a combination of impairments that is severe, she will be found not disabled. 20 C.F.R. § 404.1520(c)(2002). "A disability claimant can be considered as not suffering from a severe impairment only if the impairment is a slight abnormality having only a minimal effect on a person's ability to perform the full range of work-related activities." *Chapman v. Barhart*, 189 F.Supp.2d 795, 804 (N.D.Ill. 2002); *see also Anthony v. Sullivan*, 954 F.2d 289 (5th Cir. 1992); *McDonald v. Secretary of Health and Human Services*, 795 F.2d 1118 (1st Cir.1986); *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985). "Stated otherwise, a 'severe' impairment is any medically determinable impairment that would interfere with a person's ability to perform the full range of exertional and nonexertional work-related activities." *Chapman*, 189 F.Supp.3d at 804.

The plaintiff contends that Dr. Gotanco, the doctor who conducted the RFC consultative examination, in essence, found

20

that the plaintiff had a severe impairment because he indicated that she was capable of only medium work during the RFC evaluation.[6] However. the plaintiff has not put forth an argument as to how Dr. Gotanco's finding of medium work constitutes a severe impairment; nonetheless, the Court will evaluate the plaintiff's medium work categorization in relation to her ability to engage in any substantial gainful work.

When considering social security disability claims, for the purpose of determining the physical exertion requirements of work in the national economy, jobs are classified as "sedentary," "light," "medium," "heavy," and "very heavy." *See.* 20 C.F.R. § 416.967 (2008). These terms have the same meanings as used in the *Dictionary of Occupational Titles*, published by the Department of Labor. Such terms are used as a classification system for evaluating severe impairment claims, as opposed to a labeling system that determines if a claimant is "severely" impaired. Therefore, "medium work" is not equivalent to "severe" impairment as plaintiff contends. Pl.'s Br. at 15.

A "severe" impairment determination requires an analysis of a minimal effect on a person's ability to perform the full range of work-related activities. The proper analysis to be conducted

---

[6]"Medium" work involves lifting no more than 50 pounds at a time, frequent lifting or carrying up to 25 pounds and standing and/or walking up to about six hours in an eight hour workday. *See* 20 C.F.R. § 404.1567 (2008).

21

when determining whether or not an impairment is "severe" within the meaning of the regulation should be conducted on a case-by-case basis. For example, in *Chapman v. Barnhart,* although the plaintiff suffered from a second degree burn on her hand, testified to pain in her hand, and could not read or write, the Court found her impairment to be non-severe under the confines of the regulation. 189 F.Supp.2d 795, 799 (N.D.Ill. 2002). While, in another case *Hundrieser v. Heckler*, the plaintiff, whose employment as a maintenance mechanic qualified as "heavy," undeniably could not return to his past work because, a variety of knee problems, among other things, constituted a severe impairment. 582 F.Supp. 1231, 1244 (D.C.Ill. 1984).

Because Ms. Inendino's work required extensive sitting and occasional lifting of boxes weighing about 15 pounds, she at most qualifies as "medium" under the applicable regulations R. at 181. *See* 20 C.F.R. § 404.1567(d) (2008). After assessing the medical evidence, Dr. Gotanco concluded that the plaintiff could perform a range of medium work with some postural limitations that do not significantly limit her physical or mental ability to do basic work activities. Considering the fact that the plaintiff sat the majority of the day and only lifted boxes of paper and labels, this contradicts plaintiff's allegation that she suffered from impairments that significantly limited her ability to do basic work activities. In fact, the reason Ms.

22

Inendinc left her previous employment was wholly unrelated to her condition; she quit her job because she was "unhappy with [her] employer," and has been "unable to find another job." R. at 51. Moreover, her only complaints in relation to her condition can be prevented and minimized by simply eating candy or sitting down. For example, the plaintiff testified she eats candy and sits down when her "sugar gets low". R. at 186. Provided the plaintiff follows her own advice, she can return to her previous employment, as she admitted she could in her testimony. Consistent with the "medium" framework, the plaintiff's impairments establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on the plaintiff's ability to perform basic work activities. Therefore, the ALJ properly suspended the five-step sequential evaluation at step two.

## C. Plaintiff's Subjective Complaints

The ALJ is bound to consider certain factors in making a credibility determination, and must explicitly state why he does not believe the claimant. *Steele v. Barhart*, 290 F.3d 936, 942 (7th Cir. 2002). While an ALJ's credibility determinations are generally entitled to substantial deference, that is true only when the ALJ explicitly makes such findings and explains them in a way that affords meaningful review. *Id.* Here, the plaintiff argues that the ALJ failed to make any inquiry as to the severity

of her impairment; however, the Court finds this assertion to be unsupported.

The plaintiff testified that she has an eleventh grade education, is literate, has a current driver's license, and operates a motor vehicle. R. at 12. In addition, she stated that she has the ability to cook meals, clean, vacuum and do laundry once a week and goes shopping one to two times a week. R. at 167. The only symptoms she complained of relating to her diabetic condition were that she was often tired and confused, which she believed was caused by the Actose she took to control her blood sugar, but that these symptoms could be cured by eating candy.

The ALJ concluded that the plaintiff's testimony did not persuade him that she had a severe impairment, noting that the plaintiff's diabetes mellitus caused no significant workplace limitation and the underlying mental impairment caused no restrictions in activities of daily living, which include watching television and shopping. In addition, the ALJ noted that she had no difficulty in maintaining concentration, persistent or pace and had no episodes of decompensation of extended duration. The ALJ also considered that she only had the need for insulin for five to six months after her hospitalization in 2003, and thereafter used oral agents to control her diabetes. Moreover, she testified that is able to remedy her symptoms by

24

eating candy and has never experienced any numbness or tingling in her extremities. Even more damaging is the plaintiff's own admission that she could still do office work as she had done in the past, but would need to have candy available in the event of low blood sugar. Furthermore, Ms. Inendino's attorney had an opportunity to question the plaintiff and develop testimony regarding the severity of the plaintiff's condition and in fact did, which ultimately helped to convince the ALJ that Ms. Inendino did not have a severe impairment as defined by the regulations. Ultimately the proper questions were asked at the hearing, and insight was gained through the testimony of the plaintiff with regard to the symptoms caused by her condition; however, it is that very testimony that convinced the ALJ that her impairment was not severe. As such, the ALJ satisfied his obligations; and the Court therefore, rejects plaintiff's claim that the ALJ failed to conduct proper inquiry regarding the severity of her impairments.

## Conclusion

For the reasons set forth above, the Court finds that the ALJ's severity determination is adequate and that remand is, therefore, inappropriate. Accordingly, the Court affirms the denial of benefits in this case, and denies the plaintiff's motion for summary judgment.

Date: August 8, 2008          E N T E R E D:

Arlander Keys

MAGISTRATE JUDGE ARLANDER KEYS
UNITED STATES DISTRICT COURT

26